UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KARLA EDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:15-cv-00861-TWP-MJD |
| ) | |
| DREYER & REINBOLD INC., ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant's *Motion for Summary Judgment*. [Dkt. 36.] On October 31, 2016, District Judge Tanya Walton Pratt designated the undersigned Magistrate Judge to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 48.] In this lawsuit, Plaintiff, Karla Edson ("Edson"), asserts her employment was terminated in violation of the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). Defendant, Dreyer & Reinbold ("D&R), has moved for summary judgment on all claims. For the reasons set forth below, the Magistrate Judge recommends Defendant's Motion be **DENIED.**

**I.  Background**

The following factual background is drawn from the admissible evidence and presented in a light most favorable to Ms. Edson, the non-movant.

D&R is a car dealership that sells BMW, Infiniti, Subaru and Volkswagen vehicles. Edson worked for D&R's Greenwood, Indiana, location for more than nine years. The Greenwood dealership has four separate service drives, one dedicated to each of the four car

1

brands. Most recently, Edson held the position of Appointment Coordinator for the Volkswagen and Subaru service drives. Although Edson was responsible for setting service appointments for Volkswagen and Subaru customers, her office was located in a cubicle in the Infiniti building. Edson worked Monday through Friday, typically 52 hours a week. Edson was supervised by James Kizer ("Kizer"), the dealership's Service Manager.

On April 16, 2015 (a Thursday), Edson suffered a stroke at work. While she was able to return to work the following Monday, she continued to have difficulty walking, balancing and speaking. Soon after her return to work, Edson provided Kizer with a schedule of physical therapy appointments from her physician that would require her to leave early on Wednesdays.[1] Edson testified that Kizer was "totally non-receptive. Not only not receptive, he was like 'Well, how long do you think this is going to go on?' and I said, 'I don't know. I've never had a stroke before." [Dkt. 42-1 at 7.] Edson further testified that Kizer questioned how long the appointments would take and whether she could schedule them on her lunch hour and after work. [Dkt. 42-1 at 16.]

Kizer's recollection of their conversation included the following testimony from his deposition:

> Q: Do you remember questioning why she needed the therapy?
>
> A: Not at that time. She later brought me another list of times that she was gonna need off. I think the initial list may have been for – for tests and follow-up.
>
> The later list was a longer list of scheduled times for therapy. And it was for speech therapy and physical therapy and something else. And we were sitting in my office, and I just asked her, I said, Do you mind me asking? You're sitting here, we're having this conversation and you sound fine. I said, What – what is a – what's the speech therapy for? And she said it

---

[1] The parties' accounts of the dates differ, however the exact date is not relevant to the Court's analysis.

2

>was for her word salads. And I said, I've never heard of that before. What's "word salads" mean? And she goes, I have difficulty with my Ss and my Fs. And I said, Okay.

[Dkt. 42-3 at 9].

Around the same time, Edson had a conversation with Brian Gauker ("Gauker"), D&R's General Manager, about her therapy schedule. Edson testified that Gauker remarked: "Well, you know, the owner would want us to be . . . compassionate in these situations but we still have to run a business . . . you're going to have all these other employees that are going, well, how come she only has to work 40 hours a week and I can't just work 40 hours a week." [Dkt. 38-1 at 27.]

For the next few weeks, it appears Edson worked and attended her physical therapy/follow-up appointments as scheduled. It is undisputed that D&R approved Edson's intermittent FMLA leave request to attend her sessions. On May 11, 2015, Edson told Kizer she would be getting a "scooter" to allow her to be more mobile. She described the scooter as a walker with wheels. [Dkt. 42-1 at 16.] Edson testified that Kizer asked a lot of questions about the scooter, which suggested that Kizer was worried the scooter would not fit the company image. [Dkt. 42-1 at 18.] D&R strived to present a professional appearance and Edson testified that Gauker encouraged employees to maintain that image by "things like he won't allow popcorn to be popped in any of the buildings because he doesn't want it to smell like a circus. That if you're wearing khaki pants, you can't wear a red shirt because he doesn't want us to look like Target employees. Just general references made like that that lead me to believe that – and their concern, they're overly concerned for what this thing [the scooter] looked like." [Dkt. 42-1 at 23.]

Edson arrived at work on May 13, 2015, with the scooter. Later in the morning, Kizer asked Edson to meet with him and Rita Kahn, the office manager. Kizer told Edson that D&R

3

had restructured the staffing of its service drives and her position as appointment coordinator had been eliminated. Edson testified:

> And I said, "Wait. So you mean to tell me that after nine years of faithful service to this company, that you have no other place that you can put me?"
>
> And he goes, "Well, we already filled the position on the Volkswagen drive and the Subaru drive." Never once mentioning that they even – were even going to consider putting me over there. We already filled those positions. And he says, "And now" – and he gestured at the scooter, like I was incapable of doing, you know, another job or any particular job because of that or they just didn't want to see it, one or the other.

[Dkt. 42-1 at 21.] Following the termination meeting, Edson collected her personal belongings and left the dealership.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.,* 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller,* 570 F.3d 868, 875 (7th Cir. 2009).

The Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). The Court applies the summary judgment standard with special

scrutiny to employment discrimination cases, which often turn on issues of intent and credibility. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

### III. Discussion

For years, courts in this Circuit, when analyzing summary judgment motions in employment discrimination cases, held that employees may prove discrimination through either an "indirect" or "direct" method of proof. In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." 834 F.3d 760, 765 (7th Cir. Aug. 19, 2016). With *Ortiz* having eliminated the "rat's nest" of employment discrimination tests, the streamlined inquiry for the Court at summary judgment now is: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that a discriminatory or retaliatory motive caused the discharge? *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (applying *Ortiz* to a Title VII retaliation claim).

In this case, Edson alleges D&R terminated her employment in violation of both the ADA and the FMLA. Specifically, she alleges she was terminated because of her disability (either because she was regarded as "too disabled" to perform her job or because she needed her walker as an accommodation, or both) and because she needed FMLA leave to attend her follow-up doctor's appointments and physical therapy. In filing this motion, D&R asserts the undisputed facts demonstrate that no reasonable fact finder could conclude a discriminatory motive caused the discharge and it is entitled to judgment as a matter of law. The Court will analyze each of Edson's claims in turn below.

### A. ADA Claims

Edson's allegations constitute both discrimination and retaliation claims under the ADA. The ADA prohibits employers from discriminating against a qualified individual on the basis of his or her disability or retaliating against employees who assert their rights under the ADA. *See* 42 U.S.C. §§ 12102(1), 12203(a). To establish a discrimination claim under the ADA, Edson must show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job with or without accommodation; and (3) her employer terminated her because of her disability. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). To establish a retaliation claim, Edson must show (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) a causal connection between the two. *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

The Court will analyze Edson's discrimination and retaliation claims together because D&R only disputes the third element of the analyses – the causal connection. D&R alleges Edson has not put forth sufficient evidence that the decision to terminate her employment was motivated by her disability. Following the "evidence is evidence" directive from *Ortiz*, evaluating evidence as a whole results in a straightforward analysis. Edson relies upon several pieces of evidence to show that a reasonable juror could find her termination was motivated by discrimination or retaliation.

First, "the gesture." When Edson inquired during the termination meeting as to why there were no other positions available, Kizer explained that D&R had already filled the positions on the Volkswagen drive and the Subaru drive. Then, he raised his hand and gestured toward her scooter saying, "And now . . . like I was incapable of doing, you know, another job or any

particular job because of that or they just didn't want to see it, one or the other" [Dkt. 38-1 at 31.] Kizer denies making the gesture [Dkt. 38-7 at 12], and D&R argues that even if he did gesture toward the scooter, a fact finder would have to speculate as to what Kizer meant by the gesture to find a discriminatory motive behind the discharge. [Dkt. 37 at 10.] D&R cites to *Uhl v. Zalk Josephs Fabricators, Inc.*, for the proposition that speculation is not sufficient to defeat summary judgment. 121 F.3d 1133, 1137 (7th Cir. 1997). Yet in *Uhl*, the plaintiff was relying upon his speculation to create *any* causal connection between his disability and the termination of his employment – not speculation as to what a supervisor meant by a certain gesture during a termination meeting.

The facts, when viewed most favorably to Edson, are that Kizer gestured toward Edson's scooter while discussing the availability of other jobs for Edson. It would certainly be reasonable for a juror to infer from that gesture, and the context of the conversation, that Kizer (the decision maker) believed Edson's need for the scooter had a negative impact on her ability to work. This disputed fact alone may be enough to prohibit summary judgment. But "the gesture" is not the only evidence Edson presents.

Edson also points to several conversations she had with both Kizer and Gauker concerning her medical condition and her need for time off for physical therapy and follow-up as evidence in support of an inference of discrimination. Kizer questioned Edson's need for speech therapy, and even testified himself that he told Edson, "[y]ou're sitting here, we're having this conversation and you sound fine." [Dkt. 42-3 at 9].  Edson further asserts that Kizer "harangued" her for needing time off for physical therapy and wanted Edson to schedule the appointments during her lunch hour or after work hours. Additionally, Edson testified that Gauker was

7

concerned that giving her time off for therapy appointments would appear unfair to other employees.

Edson also points to the timing of the termination (the first day she brought her scooter to work) as evidence of discrimination. Suspicious timing by itself will rarely support an inference of discrimination in the context of retaliation, but it may do so "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). Edson testified that Kizer was "overly concerned" with the scooter's impact on the company's professional image. Then D&R terminated Edson's employment the day she arrived at work with the scooter. These pieces of evidence, viewed in a "single pile," are a more than sufficient basis upon which a reasonable fact finder could conclude that there was a discriminatory motive underlying D&R's termination of Edson.

While *Ortiz* ended the separate analysis of direct and indirect evidence, the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains. *See Ortiz,* 834 F.3d at 766. Therefore, the Court must now turn its attention to whether D&R has shown that it terminated Edson's employment for a legitimate, non-discriminatory reason. *See McDonnell Douglas*, 411 U.S. at 802. D&R asserts no discriminatory motive could exist because it made the decision to terminate Edson's employment in mid-March 2015, before she suffered the stroke. At that time, D&R argues, Kizer decided to eliminate the Appointment Coordinator position (held by Edson) in favor of two Service Greeter positions that would be located on the Volkswagen and Subaru drives. Essentially, D&R planned to split Edson's appointment scheduling duties between these two new positions. There is no documentary

8

evidence of the alleged reorganization in the service department; nor is there any documentary evidence of a decision to eliminate Edson's job. Gauker testified that he could not recall any conversations about terminating Edson prior to April 16, 2015 (the date of the stroke), and he was not notified of the termination until after the fact. [Dkt. 42-4 at 5-6.]

Edson had previously held a similar position on the Volkswagen drive. Kizer testified that he initially considered Edson for one of the two new service greeter positions; however, when Edson became aware of the restructuring she told other employees she would quit before going back to the Volkswagen drive. Edson testified that while she did express that she was not interested in returning to the Volkswagen drive, she would have taken the service greeter position for the Subaru drive. Kizer did not speak to Edson directly about the potential move. Believing that "she made her opinions pretty clear" he filled the service greeter positions with other individuals.[2] [Dkt. 42-3 at 5.] D&R terminated Edson's employment when the new service greeters were trained and it no longer needed Edson to schedule appointments, which happened to be less than a month after her stroke.

Under the familiar burden-shifting framework, of course, an employer's proffered justifications are always susceptible to attack, and Edson may defeat summary judgment if a material factual dispute exists on the question of pretext. The pretext inquiry involves more than just faulty reasoning or mistaken judgment on the part of the employer; it must be a "lie, specifically a phony reason for some action." *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731,

---

[2] The discussion between Edson and her co-worker regarding the Volkswagen drive position was outside the context of a job saving discussion; rather, it is typical of the kind of "I'd never do that" conversations that co-workers routinely share. Edson did not say she would not return to the Volkswagen line in the context of an ultimatum that it was that job or no job at all. Consequently, when viewing the facts in the light most favorable to Edson, as the Court must do at this stage of the proceeding, a material question of fact arises with regard to the credibility of Kizer's alleged belief that Edson would reject both new service greeter positions, a belief that Kizer allegedly formed without ever discussing the issue with Edson herself.

9

737 (7th Cir. 2006) (citation omitted). In assessing a plaintiff's claim that an employer's explanation is pretextual, the Court does not sit as a "'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *Culver,* 416 F.3d at 547 (citation omitted). Rather, the Court asks only whether the employer's explanation was "honestly believed." *Culver,* 416 F.3d at 540 ("An employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." (quoting *Hartley v. Wis. Bell, Inc.,* 124 F.3d 887, 890 (7th Cir. 1997))). Summary judgment is appropriate only if a reasonable fact finder would be compelled to D&R's explanation. *See Lord*, 839 F.3d at 564.

Here, taking the evidence as a whole, a reasonable factfinder could find D&R's reason was "phony." D&R asserts the termination was the result of a job elimination – a restructuring plan that was put into motion before Edson's stroke. But the "restructuring" eliminated only Edson's job, and did so less than a month after her stroke. There are no documents outlining the restructuring plan, or confirming its existence in any way. Moreover, Gauker (the dealership's General Manager) was not aware the alleged restructuring plan would result in the elimination of Edson's job. Finally, despite testimony that Edson was a good employee who did not have any discipline on her record, Kizer eliminated Edson from consideration for one of the service greeter positions based upon second-hand information from other employees that she was not interested in returning to the drive. This evidence creates a genuine issue of material fact as to whether the job elimination was a pretext for discrimination.

There is no question that there are disputed material facts surrounding the alleged restructuring plan and the termination of Edson's employment. That is precisely the reason why summary judgment is inappropriate in this case. Edson has presented sufficient evidence for a

reasonable factfinder to conclude the termination of her employment was motivated by discrimination based on her disability and a factual dispute exists as to whether D&R's explanation for the termination was pretextual. Accordingly, the Magistrate Judge recommends that summary judgment be **DENIED** as to Edson's ADA claims.

### B. FMLA Claim

Edson's FMLA claim asserts that she was terminated either because she took FMLA leave or because she would need to continue to take leave in the future (or both). Edson characterizes this as an FMLA interference claim; however, she acknowledges that D&R did not deny her FMLA leave while she was employed. [Dkt. 53 at 1 (n.1).] The difference between a retaliation and interference theory is that the first "requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman v. Federal Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005). Because Edson presented no evidence she was denied FMLA leave while employed (and, in fact, concedes this point), the Court will analyze the claim under the FMLA retaliation framework.

To succeed on an FMLA retaliation claim, the plaintiff does not need to prove that "retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision".' *Lewis v. School District #70,* 523 F.3d 730, 741–42 (7th Cir. 2008) (quoting *Culver,* 416 F.3d at 545). From here, the Court's analysis mirrors that of Edson's ADA discrimination claim. The relevant question at summary judgment: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that a retaliatory motive related to Edson's exercise

of her rights under the FMLA caused the discharge? *See Lord*, 839 F.3d at 563 (applying *Ortiz* to a retaliation claim).

The Court finds that it does. The evidence discussed above is equally applicable to Edson's FMLA retaliation claim. Kizer questioned Edson's need for speech therapy and asked her to schedule the appointments during her lunch hour or after work. Gauker expressed concern that allowing Edson time off for physical therapy appointments would appear unfair to other employees. When explaining to Edson that the service greeter positions had already been filled, Kizer gestured to her scooter saying "and now," reasonably implying that Edson's condition prohibited her from performing the job.

Although D&R asserts there was no causal connection between Edson's need for FMLA leave and the termination of her employment, the Court finds a jury could conclude otherwise.[3] Accordingly, the Magistrate Judge recommends that summary judgment be **DENIED** as to Edson's FMLA claim.

### IV.  Conclusion

In its briefing on this Motion, D&R seems to ask the Court to view the designated evidence in a light more favorable to itself or to weigh the conflicting designated evidence. However, the well-established standard for summary judgment is that the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor," *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted), and does not weigh the evidence. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th

---

[3] The pretext analysis above likewise applies to Edson's FMLA claim.

Cir. 2007). Consequently, based upon analysis above, the Magistrate Judge recommends D&R's *Motion for Summary Judgment* [Dkt. 36] be **DENIED** in its entirety.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  13 DEC 2016

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Jeffrey B. Halbert
BOSE MCKINNEY & EVANS, LLP
jhalbert@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com